DISCIPLINARY COUNSEL *v.* HOWARD.

[Cite as *Disciplinary Counsel v. Howard,* 123 Ohio St.3d 97, 2009-Ohio-4173.]

*Attorneys at law — Misconduct — Felony convictions — Two-year suspension with conditions for reinstatement.*

(No. 2009-0407 — Submitted April 8, 2009 — Decided August 25, 2009.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 08-012.

_____

**Per Curiam**.

{¶ 1} Respondent, Lee Howard of Dayton, Ohio, Attorney Registration No. 0026930, was admitted to the practice of law in Ohio in 1977. On August 30, 2007, we suspended respondent from practice on an interim basis pursuant to Gov.Bar R. V(5)(A)(4) upon receiving notice that he had been convicted of a felony. *In re Howard*, 114 Ohio St.3d 1515, 2007-Ohio-4425, 872 N.E.2d 955.

{¶ 2} The Board of Commissioners on Grievances and Discipline now recommends that we suspend respondent's license to practice for two years, order conditions for his readmission including a mental-health evaluation, and afford credit for the interim suspension of his license. The board made this recommendation based on findings that respondent had been convicted of two felonies, both stemming from his part in a standoff with police. We accept the board's findings that respondent committed professional misconduct and its recommendation for a two-year suspension with conditions for readmission.

{¶ 3} Relator, Disciplinary Counsel, charged respondent with violations of two Disciplinary Rules of the former Code of Professional Responsibility: DR 1-102(A)(3) (prohibiting a lawyer from engaging in illegal conduct involving moral turpitude) and 1-102(A)(6) (prohibiting a lawyer from engaging in conduct

that adversely reflects on the lawyer's fitness to practice law). A panel of the board heard the case, made findings of fact and conclusions of law, and recommended an indefinite suspension with attendant conditions for respondent to petition for reinstatement and with credit for the interim licensure suspension. The board adopted the panel's findings of misconduct, but "based on all the circumstances surrounding his arrest and conviction," recommended the two-year suspension of his license with credit for the interim suspension and conditions for readmission.

{¶ 4} Neither party has objected to the board's report.

**Misconduct**

{¶ 5} Respondent pleaded guilty in April 2007 to assault with a deadly weapon in violation of R.C. 2903.11(A), a felony of the second degree, and to inducing panic in violation of R.C. 2917.31(A), a felony of the fifth degree. The convictions followed from incidents beginning on the night of January 19, 2007, when a Dayton police officer entered the back yard of respondent's former East Hudson Avenue residence to investigate what the officer thought could be a stolen vehicle. The officer's investigation and respondent's reaction led to a standoff lasting several hours.

{¶ 6} The officer, who had been dispatched in uniform and in a marked cruiser to identify and recover a stolen car from an address near respondent's house, found the car in an alley around 11:00 p.m. While waiting for a tow truck in that high-crime neighborhood, the officer saw another car parked, apparently in the grass, almost touching the back of a house that was completely unlit. Suspecting that that car might too be stolen, the officer fixed his searchlight on the back of the house and got out of his cruiser to take down the license plate number and run a check on the vehicle.

{¶ 7} In the meantime, respondent awoke inside his home to the searchlight shining in a first-floor window. Looking out, he testified, he did not

see the officer because of the searchlight shining in his face. Respondent opened the window and discharged a firearm, intending, he testified, only to frighten whoever was in his yard. The officer, who never identified himself as the police, called out, shouting, "Hey Buddy, did you throw something or shoot something at me?" The officer heard nothing but a low "growl" in response.

{¶ 8} The officer then circled the house, and upon returning to the back yard, saw someone at the open window. The officer shined his flashlight in the window and demanded, "Now are you going to talk to me now or what?" At that moment, the officer saw a "white arm" reach out with a black handgun. Saying nothing, respondent fired a shot and quickly closed the window.

{¶ 9} The situation then escalated. The officer called for backup, and more officers arrived to secure the area, blocking traffic and warning neighbors to remain indoors. Officers attempted to communicate with respondent by telephone and bullhorn, but to no effect. The bullhorn was respondent's first indication that the person who had been in his back yard was a police officer.

{¶ 10} Officers also called in a SWAT team, members of which discovered a bullet hole in the rear passenger door of the first officer's cruiser. A standoff lasting several hours ensued, with respondent refusing to answer the telephone. When he finally did answer his telephone, he spoke for about an hour with a hostage negotiator and, according to his testimony, fully realized only then that the police were on the premises. Respondent refused to leave his house, despite all demands and assurances. The situation finally ended with the SWAT officers firing tear gas, which forced respondent out of the house and led to his apprehension.

{¶ 11} At his April 2007 sentencing, the Montgomery County Court of Common Pleas placed respondent under five years of intensive community supervision, requiring him to (1) undergo "crisis care" assessment and comply with all recommended treatment, (2) attend a "Victim Impact Panel/Victim of

Violence" program, (3) obtain verifiable full-time employment, (4) move from his East Hudson Avenue address, and (5) pay all court costs, a supervision fee of $50, and restitution of $6,198.95. The court also ordered the destruction of the handgun and six hunting guns found during a search of respondent's residence.

{¶ 12} But because of respondent's good behavior, the court modified the terms of his sentence. In May 2008, respondent's intensive community supervision was reduced to basic probation. And in September of that year, the court reduced the sanction again to "monitored time supervision."

{¶ 13} Respondent did not appeal his convictions and at the panel hearing did not dispute the charges of misconduct. The panel and board thus found respondent in violation of DR l-102(A)(3) and (6). We accept these findings of misconduct.

### Sanction

{¶ 14} In recommending a sanction, the panel and board weighed the aggravating and mitigating factors listed in BCGD Proc.Reg. 10(B)(1) and (2) and compared sanctions imposed in similar cases.

{¶ 15} The panel and board weighed in respondent's favor that he had practiced nearly 30 years with no prior discipline. See BCGD Proc.Reg. 10(B)(2)(a). Respondent had also cooperated during the disciplinary proceedings, acknowledging his criminal conduct and convictions. See BCGD Proc.Reg. 10(B)(2)(d). Moreover, because respondent was in the process of paying the price for his crimes, the panel and board found mitigating the imposition of other fines and penalties. See BCGD Proc.Reg. 10(B)(2)(f). In addition, the panel and board accepted letters in support of respondent's character and reputation that his family and a retired Dayton police sergeant had written for the presentence investigation.

{¶ 16} But because respondent had "twice shot a loaded handgun at a uniformed police officer at close range," the panel and board found the aggravating features overwhelming. Both noted from respondent's testimony that

"he had been awakened out of a deep sleep by a bright light shining into the window of his totally darkened house at approximately 11:00 p.m." and that because his car had recently been stolen twice, "he believed [that the officer] was a criminal trespasser attempting to steal his auto." The panel and board also acknowledged that "a seven-year police street officer had failed to get control of a situation which he had 'caused' by accessing private property where a car was legally parked" without first properly identifying himself. The panel and board nevertheless held respondent principally accountable for the fact that a police officer's attempt to investigate a crime against property had "quickly morphed into a physical threat to the officer's own life and safety." Adopting the panel's report, the board concluded:

{¶ 17} "[T]here was no doubt * * * that Respondent had not only created a dangerous situation for a uniformed police officer; his behavior had also called into play a very dangerous situation for his neighborhood and for the Dayton Police Department."

{¶ 18} Though not considered a mitigating or aggravating factor, respondent's explanation for his conduct during the standoff troubled the panel and board. When asked why he had not come out of his house in response to officer's requests and demands, respondent testified: "I was afraid for my safety. They had been doing things to, in my opinion, lure me outside" and "it seemed like I was under attack by terrorists or something." Respondent said he had believed at the time that the police were trying to hurt or kill him, testifying:

{¶ 19} "[I]n my opinion when they started flashing those amber lights on that SWAT vehicle in my backyard, they were trying to provoke me into firing another shot; and then it would have all been over. The reason I didn't go out was because I have heard of instances where police officers have beaten people, sometimes killed people; and I have also heard of situations where they never get punished for that. They can get away with it."

{¶ 20} Respondent did not offer proof of a mitigating mental disability under BCGD Proc.Reg. 10(B)(2)(g). This testimony nevertheless raised concerns for the panel and board about his mental fitness at the time of the standoff and since that time. Respondent implicitly acknowledged a possible problem himself, promising "wholeheartedly" to comply with any conditions of reinstatement that included a mental-health evaluation.

{¶ 21} As for sanctions imposed in similar cases, the panel recommended respondent's indefinite suspension from practice mainly on the authority of *Disciplinary Counsel v. LoDico,* 118 Ohio St.3d 316, 2008-Ohio-2465, 888 N.E.2d 1097. In that case, we indefinitely suspended a lawyer from practice, giving no credit for his interim suspension under Gov.Bar R. V(5)(A)(4), after he was convicted of one count of carrying a concealed weapon, a felony of the fourth degree, and six misdemeanor counts of aggravated menacing. The convictions resulted from an incident in which the lawyer, after a night of heavy drinking, held six people in a bar parking lot at gunpoint, one after another, with a .45-caliber pistol and laser sight. And that was not the lawyer's first disciplinary sanction. Within the preceding three years, that lawyer had been suspended from practice for 18 months, albeit with a conditional stay of six months, for unprofessional, undignified, and discourteous conduct in separate incidents before two common pleas court judges.

{¶ 22} Even the panel acknowledged, however, that respondent's misconduct did not rise to the level of malfeasance in *LoDico*. The board apparently seized on this distinction in modifying the recommendation for an indefinite suspension based "on all the circumstances surrounding his arrest and conviction." Implicitly, the board found extenuating the facts that respondent lived in a high-crime neighborhood, that his car had already been stolen twice, and that the investigating officer did not properly identify himself before he began a search of respondent's property. The respondent had also been frightened

before by unidentified persons shining bright lights into his home. These circumstances in no way excuse respondent's criminal conduct; however, they do offer insight into why respondent endangered police officers, his neighbors, and himself on the night in question, an element not present in the *LoDico* case.

{¶ 23} Another distinguishing feature is respondent's previously unblemished professional record. And here, unlike in *LoDico*, the sentencing court reduced conditions for respondent's community control and probation, indicating that it has reassessed his threat to society. Respondent's willingness to obtain treatment for a possible mental disorder also weighs in his favor.

{¶ 24} Thus, having accepted the board's findings of misconduct, we also accept the recommendation for a two-year suspension. Our decision allows respondent to forgo the full-freighted petition for reinstatement and hearing process that applies to indefinite suspensions under Gov.Bar R. V(10)(B) through (G). We find this safeguard for the public's protection unnecessary in this case, given the evidence of mitigation, respondent's amenability to psychological assessment, and the unique circumstances of the underlying misconduct. For the same reasons, we accept the recommendations to order a mental-health evaluation as a condition of respondent's reapplication to practice under Gov.Bar R. V(10)(A) and to allow credit for his interim suspension.

{¶ 25} Respondent is therefore suspended from the practice of law in Ohio for two years, with credit from August 30, 2007, for the interim suspension imposed in *In re Howard*, 114 Ohio St.3d 1515, 2007-Ohio-4425, 872 N.E.2d 955. As a condition for readmission to practice, respondent must prove to a reasonable degree of psychological certainty that he is able to return to the competent, ethical, and professional practice of law. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

O'CONNOR, J., dissents and would indefinitely suspend respondent from the practice of law in Ohio.

_____

Jonathan E. Coughlan, Disciplinary Counsel, and Phillip A. King, for relator.

Lee Howard, pro se.

_____